IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

GLORIA A. WILLIS                                              PLAINTIFF

VS.                          CASE NO. 04-CV-1107

UNITED FOOD AND COMMERCIAL
WORKERS UNION, LOCAL 2008                                     DEFENDANT

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed on behalf of the Defendant United Food and Commercial Workers Union, Local 2008. (Doc. No. 13). The Plaintiff Gloria A. Willis has responded to the motion. (Doc. No. 18). The Court finds the matter ripe for consideration.

## BACKGROUND

In 1994, the Plaintiff Gloria Willis began working as a production worker in a chicken processing plant in El Dorado, Arkansas. The plant was formerly operated by ConAgra Poultry and in 2004 was operated by Pilgrim's Pride Corporation. As a production worker at the plant, Willis was part of the collective bargaining unit represented by the United Food and Commercial Workers Union, Local 2008 (hereinafter referred to as the "Union").[1] The procedure in which an employee can file grievances against the company is set out in the collective bargaining agreement between the Union and the company. Under the agreement, the Union elects or appoints stewards from among the employees to handle employee grievances against the

---

[1] *Def.s Ex. B, Affidavit of Thelma Broom.*

company. In the first step of the grievance procedure, the aggrieved employee and the line steward take the employee's grievance or complaint to the department supervisor. If the matter is not settled, the matter would go to the second step. In the second step, a written grievance is submitted to the company and a second step meeting is held. In the second step meeting, the aggrieved employee, the walking steward, the line steward and any witnesses meet with a company representative, usually the human resources manager and the department supervisor to discuss the grievance. The human resources manager then responds to the employee's grievance by giving the company's written answer to the walking steward. If a settlement is not reached at this step, the aggrieved employee or the Union may appeal the matter to the third step. At this third step, the grievance is again presented to the company and a meeting is held. Those present at the third step meeting are the aggrieved employee, the walking steward, the line steward, any witnesses and a union representative along with the company's human resources manager or plant manager. After the grievance is discussed, the company's written answer is given to the union representative. If the matter is not settled, then the matter may be submitted to arbitration.[2]

In July 2001, Willis was discharged for fighting.[3] The Union represented Willis in connection with her termination and took the case all the way to arbitration. The case was settled in December 2001 with Willis being reinstated with no loss of seniority, her discipline

---

[2] *Def.s Ex. E, Collective Bargaining Agreement between UFCW and Prilgrim's Pride, Article 6, pp. 7-9.*

[3] *Def.'s Ex. D, p. 1.*

2

purged and ½ back pay.[4] After Willis returned to work in early 2002, she filed several grievances in connection with the company's wrongly reporting her 2001 back pay payment as 2002 income.[5] The Union presented the grievances to the company and it appears that the matter was eventually straightened out.

From 2002 through 2003, Willis filled approximately nineteen other grievances against the company.[6] The grievances were filed in connection with unfair treatment by various company supervisors and other employees. The Union represented Willis in all these grievances. The majority of these grievance were found to lack merit and dropped. Therefore, no substantial relief was obtained for Willis with the exception of one written warning being removed from her file pursuant to a grievance filed on March 6, 2003.[7]

Between April 9, 2004 and April 20, 2004, Willis filed seven grievances with the Union. These grievances were against various company supervisors and/or superintendents. In the seven grievances, Willis alleged that she was being harassed by a supervisor for no reason[8]; that she was unfairly written up by a supervisor (Lorene Charles) because of her slow speed[9]; that a superintendent (Willie[10] Reedus) wanted her to throw birds in the trash and threatened to write

---

[4] *Id., p. 5.*

[5] *Def.'s Ex. D, pp. 7, 24-26, 28-34.*

[6] *Id., pp. 6. 8-23, 27, 35-58.*

[7] *Id., p. 39.*

[8] *Id., p. 59.*

[9] *Id., p. 60.*

[10] In her grievance, Willis only refers to this superintendent as Willie. The Court believes this to be Superintendent Willie Reedus.

her up if she did not do so[11]; that a superintendent (Willie Reedus) talked to her in a very aggressive manner[12]; that a supervisor (Lorene Charles) was harassing and intimidating her because she worked on the end of the line[13]; that because a superintendent and a supervisor (Willie Reedus and Lorene Charles) told her that a certain number of birds needed to be processed each minute, she should be paid by the minute[14]; and that a superintendent and a supervisor (Willie Reedus and Lorene Charles) were discriminating against her on the basis of her religion when they made fun of her in a union meeting[15]. Each of these grievances was presented to the company by the Union.

On April 28, 2004, these seven grievances were taken to a second step meeting attended by Willis, Union Steward Beverly Larry[16], Union Steward Sharon Norful Henry, Union Representative Thelma Broom, Human Resources Manager Ray Poole, his assistant Cassandra Nathan, Superintendent Willie Reedus and Supervisor Lorene Charles.[17] Each of Willis' grievances was presented and discussed at the meeting, with Willis repeatedly saying that she

---

[11] *Id., p. 61.*

[12] *Id., pp. 62 & 63.*

[13] *Id., pp. 64-67.*

[14] *Id., p. 68.*

[15] *Id., p. 69.*

[16] In Willis's deposition, the name of the Union steward present at this meeting is referred to as Barry Lowrey and Beverly Lowrey. The Court believes that the steward's name was misstated by Willis and the party's true name is Beverly Larry as set out in the affidavits of Union Steward Sharon Norfol Henry and Union Representative Thelma Broom.

[17] *Def.'s Ex. A, Deposition of Gloria Willis, pp. 10-11.*

wanted to go to the next step of the grievance procedure.[18]

On April 29, 2005, Union Steward Sharon Norful Henry received two grievances from Willis dated April 28, 2004. The grievances complained that Willis was still being harassed by a supervisor (Lorene Charles) and/or a superintendent (Willie Reedus).

On May 3, 2004, the company's HR Manager responded to each of Willis' seven grievances discussed at the April 28, 2004 meeting. The company denied each grievance on the basis that either discrimination had not been established, no write up existed in Willis's file or the fact that an employee's wages were paid at an hourly rate as negotiated in the current labor agreement.[19]

Thereafter, these grievances were reviewed further by Union Representative Thelma Broom, Union Steward Sharon Norfol Henry, Union President Mike Keen and Union Secretary-Treasurer Charles Lee. They agreed that none of these grievances had any merit and Thelma Broom authorized Henry to drop the grievances.[20] It was decided not to appeal the grievances to the third step, and on May 5, 2005, the company and the Union signed off to that effect on Willis' submitted grievances forms.[21] On May 11th or 12th Henry informed Willis that the Union had decided to drop the seven grievances filed between April 9th and April 20th.[22] [23]

---

[18] *Def.'s Ex. B, Affidavit of Thelma Broom.*

[19] *Def.'s Ex. D, pp. 59-69.*

[20] *Def.'s Ex. B, Affidavit of Thelma Broom.*

[21] *Def.'s Ex. D, pp. 59, 60, 61, 62, 64, 68 & 69.*

[22] *Def.'s Ex. C, Affidavit of Sharon Henry.*

[23] *Def.'s Ex. A. Deposition of Gloria Willis, p. 19.*

On May 26, 2004, it appears that Willis met with Union Steward Beverly Larry in connection with her two April 28th grievances. The matter was not settled and the grievances were taken to the second step. A second step meeting was held on June 3, 2004 where the grievances were presented to the company. Willis, Union representative Thelma Broom, Union Steward Sharon Norfol Henry and two employee witnesses were present at the meeting along with HR Manger Ray Poole. The grievances were discussed and the witnesses questioned with no settlement being reached. The company denied both grievances on the grounds that no discrimination had been established.[24] Willis repeatedly stated that she wanted to proceed to the third step.

In late May or early June, Willis filed a series of twelve more grievances with the Union. These grievances contained complaints by Willis of mistreatment by her supervisor and superintendent,[25] mistreatment by Ray Poole and Gary Davis[26], discrimination by Union Steward Sharon Norful Henry and Union Representative Thelma Brown[27], along with complaints about the temperature within her department [28] and a request for back pay which she claims the company owed her.[29] None of these grievances proceeded through the grievance procedure because Willis left work on June 4, 2004 and never returned.

---

[24] *Def's Ex. D, pp. 70 & 71.*

[25] *Id., pp. 72 & 80.*

[26] *Id., pp. 73, 74, 75 & 83.*

[27] *Id., pp. 76, 77, 78 & 79.*

[28] *Id., p. 81.*

[29] *Id., p. 82.*

On June 4, 2005, Willis complained to Human Resources that a co-worker had talked very aggressive to her, accusing her of not counting the birds right.[30] Willis also claimed the co-worker had a knife in her hand and that she was fearful for her life. Willis wanted to call the police because she had been threatened but HR Manager Ray Poole refused. After talking to the parties and various witnesses, Poole sent Willis home for the rest of the day with pay and told her that it had been decided to move her temporarily to another department when she returned.[31] Willis did not return to work after June 4, 2004. Ray Poole sent Willis a letter on June 14, 2004 informing her that if she did not return to work immediately she would be discharged for absenteeism.[32]

On June 23, 2004, the Union received from HR Manager Ray Poole seven grievances which Willis had mailed directly to the company. The grievances were dated June 9, 2004 and claimed that the reason Willis was off work was the offensive working environment at the company,[33] that a supervisor (Lurene Charles) had caused the confusion between Willis and her co-worker,[34] that a supervisor (Lurene Charles) gave a false statement concerning the incident on June 4, 2004,[35] that the HR Manager decided to move her from her job because she

---

[30] *Def.'s Ex. A, Deposition of Gloria Willis, p. 42-44.*

[31] *Def.'s Ex. A, Deposition of Gloria Willis, p. 53; Def.'s Ex. C., Affidavit of Sharon Norfol Henry.*

[32] *Def.'s Ex. D, p. 97.*

[33] *Id., p. 85.*

[34] *Id., p. 86.*

[35] *Id., p. 87.*

7

complained so much,[36] that a superintendent (Willie Reedus) acted very aggressive to her at the June 3, 2004 meeting,[37] that Union Steward Sharon Norful Henry did not adequately represent her when HR Manager Ray Poole decided to move Willis' from her job,[38] and that Ray Poole discriminated against her when he refused to call the police,[39] These grievance were given to the Union Representative, Thelma Broom.[40] After Broom consulted with Union Steward Sharon Norful Henry and Union President Mike Keen, it was determined that the 21 grievances (the two grievances dated May 29, 2005, the twelve grievance filed in late May or early June and the seven grievances dated June 9, 2004 and received on June 23, 2004) would be withdrawn on the grounds that there was no merit to any of her complaints.[41]

On May 28, 2004, Willis filed a charge against the Union with the National Labor Relations Board alleging that the Union had breached its duty of fair representation by dropping her grievances at the second step.[42] The NLRB investigated Willis' charges and determined that there was insufficient evidence to establish a violation of the Act by the Union. The charges were dismissed by the Regional Director.[43] Willis appealed the Director's decision to the

---

[36] *Id., p. 88.*

[37] *Id., p. 89.*

[38] *Id., p. 90.*

[39] *Id., p. 91.*

[40] *Def.s Ex. C, Affidavit of Sharon Norful Henry.*

[41] *Def.s Ex. B, Affidavit of Thelma Broom.*

[42] *Def.s Ex. D, p. 92.*

[43] *Id., p. 93-94.*

NRLB's Office of Appeals. On September 30, 2004, the Office of Appeals denied Willis' appeal on the bases that there was no evidence that the Union failed in its duty to represent her or that the Union's decisions were based on unlawful considerations or any other discriminatory reason.[44]

On September 13, 2004 Willis filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race, sex, and religious discrimination and relaliation against the Union. On September 29, 2004, she received a Right to Sue letter from the EEOC.

On November 4, 2004, Willis filed this Title VII lawsuit against the Union. In the suit, Willis alleges that the Union discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII") on the basis of her race, sex and religion in the handling of her grievances. She also claims that the Union retaliated against her in violation of Act. The matter is now before the Court on the Union's Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995). The Supreme

---

[44] *Id., p. 95-96.*

Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

## DISCUSSION

In its role as a collective bargaining representative, a union has a legal duty to represent

all employees fairly, without hostility or discrimination. *See Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). "This duty of fair representation is a judicially created duty arising out of the statutory grant of exclusive representation to unions under the National Labor Relations Act." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 C.Ct. 681, 97 L.Ed. 1048 (1953). A member of a collective bargaining unit may bring a claim against the union for unlawful discrimination under Title VII if the union breached its duty of fair representation and the breach was for discriminatory reasons. 42 U.S.C. §2000e-2(c)(1). Therefore, in order to establish a prima facie Title VII case against a union based upon a failure or refusal to represent a union member a plaintiff must show that the union breached its duty of fair representation and the breach was motivated by the member's race, color, religion, sex or national origin. *Carter v. United Food & Commercial Workers, Local No. 789,* 963 F.2d 1078, 1082 (8th Cir. 1992)(*citing Martin v. Local 1513 and Dist. 118 of the IAMAW,* 859 F.2d 581, 584 (8th Cir. 1988).

In this case, Willis contends that the Union breached its duty of fair representation toward her when it refused to pursue her grievances beyond the second step of the grievance procedure. She also contends that this breach was the result of discrimination based on race, gender, religion and retaliation. To determine if Willis has presented a viable Title VII claim, the Court must first look to see if the Union breached its duty to fairly represent Willis in the grievance process.

The grievance procedure in this case involved four steps. In the first step, the aggrieved employee and the line steward would take the employee's grievance to the department supervisor. If the matter was not settled, the matter would be taken to a second step meeting. This meeting involved the aggrieved employee, the walking steward, the line steward and any

11

witnesses along with the human resources manager and the department supervisor to discuss the employee's grievance and attempt to resolve the matter. If a settlement is not reached, the grievance could be appealed to the third step. At this step, the grievance is again presented to the company and a meeting is held between the aggrieved employee, the walking steward, the line steward, any witnesses and a union representative along with the company's human resources manager or plant manager. If the matter is not settled, then the matter may be submitted to arbitration.

Here, the Union accepted all of Willis's grievances, investigated each of them, presented them to the company and processed them through the second step of the grievance procedure. At the second step meeting, Willis was represented by both a union steward and a union representative. After this meeting, the Union, through Union Steward Sharon Norful Henry, Union Representative Thelma Broom, Union President Mike Keen and Union Secretary-Treasurer Charles Lee, determined that Willis' grievances had no merit and the Union Representative authorized the Union Steward to drop the grievances. Willis contends that this action by the Union breached its duty to represent her fairly because she wanted to go to the next step. However, a union is not required to take every employee grievance all the way through to arbitration. If a union believes in good faith that a grievance is without merit, it is under no obligation to pursue it to arbitration. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Here, the Union pursued Willis' grievances until such time as it was determined that they had no merit, therefore, the Court does not believe that the Union breached its duty of fair

representation toward Willis.[45]

However, assuming that some question was raised as to the fairness of the Union's representation, Willis has not presented any evidence that shows that the Union's refusal to take her grievances further in the grievance process is based upon any discriminatory animus on the part of the Union. Willis does argue that the Union treated her differently during her grievance meetings with the company. But, she has not produced any evidence that shows that the Union represented similarly situated employees who were not in the protected classes differently by taking their grievance further in the grievance process than it did with hers. A substantial majority of the employees at Pilgrim's Pride are black and virtually all of Willis' co-workers are black women. The union stewards who handled Willis' grievances were black women, as was the union representative who authorized the dropping of Willis' grievances. There is no evidence that the Union handled Willis' grievance any differently than it did those of white employees or male employees.

Willis also claims that the union representatives talked harshly to her concerning her religion. Theses stray comments are not enough to show religious animus on the part of the Union.

The Union has presented a legitimate nondiscriminatory reason for dropping Willis' grievances. It claims that it represented Willis fully and only dropped her grievances when it was determined that the grievances had no merit. The evidence before the Court shows this to be true. The Union accepted all of Willis' grievances, investigated each of them, presented them

---

[45] The NLRB came to this same conclusion, dismissing Willis' charge against the Union for failure to fairly represent her in the grievance process.

to the company and processed them through the second step of the grievance procedure only dropping them after it analyzed the evidence and determined they had no merit. Willis has not produced any evidence to rebut the Union's legitimate nondiscriminatory reason for its failure to process Willis' grievances further or to infer that its reason for dropping the grievances was a pretext for discriminatory animus. The only proof that Willis presents in support of her claims is that she wanted to go to the next step of the grievance procedure and the Union declined to do so. Such conduct alone on the part of the Union does not infer discriminatory animus. Willis also claims that the Union and its representatives were "working for the company" when they were supposed to be representing her. She points to the fact that Union Steward Sharon Norful Henry is now employed by Pilgrim's Pride and the belief that Henry "wrote her up" on April 9, 2004.[46] However, this is not evidence of unlawful discrimination under Title VII. The evidence shows that the Union, through Sharon Henry, processed all of Willis' grievances and the decision to drop her grievances was based upon a legitimate nondiscriminatory reason. There is no evidence before the Court that points to a discriminatory motive based on race, gender or religion on part of the Union in dropping Willis' grievances after the second step.

     Willis also claims that she was retaliated against by the Union in its handling of her grievances in violation of 42 U.S.C. §2000e-3(a). To establish a prima facie case of retaliation, Willis must demonstrate that she was engaged in a protected activity, that she suffered meaningful adverse action subsequent to that activity and that there was a causal link between the two. *Elisero v. United Steelworks of America Local 310,* 398 F.3d 1071 (8th Cir. 2005).

---

[46] Willis' file does not contain a "write up" from management or Henry dated April 9, 2004.

Willis claims that the Union retaliated against her because she told Union President Mike Keen that God got her job back for her in 2001, not the Union, that she told HR Manager Ray Poole that Union Steward Sharon Norful Henry was doing his job for him and that she filed so many grievances against the company. Telling the Union President that God got your job back and telling a company employee that someone else was doing his job are not protected activities under Title VII but filing grievances against the company are. Therefore, Willis has satisfied the first element of her prima facie case. However, she has failed to satisfy the second element as she cannot show any meaningful adverse action by the Union subsequent to the protected activity. The Union accepted all of Willis's grievances, investigated each of them, presented them to the company and processed them through the second step of the grievance procedure. The Union was under no obligation to process the grievances further once it determined they had no merit. Willis received all the Union representation to which she was entitled despite the fact that she filed multiple grievances on almost a weekly basis. "Not everything that makes an employee unhappy is an actionable adverse action." *Manning v. Metro. Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir. 1997). Because Willis can not show a meaningful adverse action on the part of the Union the Court need not address the causal connection element of her prima facie case.

      In a summary judgment motion, the Court is to view the evidence before it in the light most favorable to the nonmoving party. However, in this case, Willis has not given the Court any evidence which would create a genuine issue of material fact from which a jury could find discrimination by the Union based on race, gender, religion or retaliation. Summary judgment, therefore, is appropriate in this case.

CONCLUSION

Base upon the foregoing reasons, the Court finds that the Motion for Summary Judgment filed on behalf of the Union should be and hereby is **granted** and the lawsuit should be dismissed. A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 27th day of January, 2006.

    /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge